UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ROGER L. FULMER, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:04-0879 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| MPW INDUSTRIAL SERVICES, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by the defendant (Docket No. 32), to which the plaintiff has responded (Docket No. 39) and the defendant has replied (Docket No. 47). For the reasons discussed herein, the defendant's motion will be granted.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The defendant corporation operates throughout North America and provides industrial cleaning services to the utility, pulp, paper, steel, and automotive industries.[1] In February 1997, the defendant hired the plaintiff to work as a Branch Manager and to open and operate its

---

[1] Unless otherwise noted, the facts have been drawn from the plaintiff's Complaint (Docket No. 1, attach. Compl.), the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Docket No. 40), and the plaintiff's Response in Opposition to Motion for Summary Judgment (Docket No. 39).

1

Nashville office. Under the terms of his employ, the plaintiff was required to execute non-compete and non-disclosure agreements. Such agreements were included as part of his employment application and as a condition to his participation in the management bonus program.

At the time of the plaintiff's employment with the defendant, the Tennessee Valley Authority (TVA) was the largest and most important client of the defendant's Nashville office. It supplied approximately three-fourths of that branch's revenue. The terms of the defendant's contract with the TVA required it to pay specific rates to laborers and foreman, as well as to "make a contribution for health and welfare benefits and a contribution for pension benefits on all TVA contracts." (Docket No. 40 ¶ 24) In "the latter part of 2000 or the early part of 2001," the plaintiff became concerned about the manner in which the defendant was making these payments, and he came to believe that the defendant was charging its customers overtime rates, yet paying its employees at "straight time" levels. (Docket No. 39 at 2)

Believing these practices to be improper, the plaintiff, in 2001, reported them to Monte Black, the defendant's president and CEO. Throughout 2001, 2002, and 2003, the plaintiff continued to raise the issue with various members of the defendant's management, including Vice President of Operations Jim Mock, Regional Controller Peter Schumacher, Director of Human Resources Patrick O'Rourke, Human Resources Administration Manager Stella Samons, and Division Manager Robby Speights.

The plaintiff claims that these complaints were met with "stiff resistance" and that he "received no assurance that the problem would be fixed." (Docket No. 40 ¶ 30) The defendant responds that its employees researched the issue and repeatedly explained to the plaintiff that its

2

practices were permissible and that, accordingly, no remedies were in order. (Docket No. 47 at 10) The plaintiff admits that no one associated with the defendant ever "explicitly or implicitly threatened [the plaintiff's] job because of his repeated complaints about [the defendant's] pay practices." (Docket No. 40 ¶ 41)

The plaintiff believed that he was doing well in his position as a branch manager. He received a substantial bonus and a salary increase in 2002 and 2003, respectively. The plaintiff also believed, however, that he would not be promoted during his employ with the defendant. In approximately early 2003, he began speaking with representatives of Onyx Industrial Services (Onyx) about employment opportunities with that corporation. Onyx is the defendant's direct competitor in Tennessee and surrounding areas.

Onyx eventually offered the plaintiff a position as a regional manager, which included a compensation package worth more than what the plaintiff was receiving from the defendant. The plaintiff accepted this offer in approximately August 2003. He then entered into non-compete and non-disclosure agreements with Onyx. The plaintiff resigned from his position with the defendant effective August 8, 2003. Two senior operations managers who had worked under the plaintiff soon left the defendant to go to work for Onyx as well. (*See* Docket No. 33 at 1)

On August 13, 2003, the defendant filed, in the Davidson County Chancery Court, an injunction action against the plaintiff, the two operations managers who had departed with him, and Onyx.[2] (*See* Docket No. 46 ¶ 18) Based upon non-compete agreements between MPW and

---

[2]In October 2003, the defendant and Onyx reached a settlement in this state court case, pursuant to which MPW dismissed with prejudice its claims against each of the defendants, including the plaintiff in this case. (Docket No. 33 at 1)

3

the three men, the Chancery Court issued a restraining order that temporarily prevented the men from being employed by Onyx. (*See id.*)

On September 17, 2003, after conducting an evidentiary hearing and determining that the non-compete agreement the plaintiff had signed with the defendant was unenforceable, the Chancery Court dissolved the restraining order. According to the plaintiff, after "almost four months of unemployment," he then began his employ with Onyx.

## ANALYSIS

**I.     Summary Judgment Standard**

The defendant has moved for summary judgment on the plaintiff's claims that the defendant tortiously interfered with his business relationships and impermissibly constructively discharged him. Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not

4

to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

5

**II.     No reasonable jury could find that the defendant tortiously interfered with the plaintiff's business relations.**

In order to demonstrate that a defendant is liable for tortious interference with his business relationships,[3] a plaintiff must demonstrate the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means;  and (5) damages resulting from the tortious interference.  *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (emphasis and internal citations omitted).  In the instant case, the defendant asserts that the plaintiff has failed to demonstrate the existence of the latter two elements of this claim.

The first of the contested elements requires the plaintiff to demonstrate either that (1) the defendant had an improper motive, *i.e.*, its "predominant purpose" in seeking to end the plaintiff's business relationship was "to injure the plaintiff"; or (2) the defendant used improper means, *e.g.*, means that were independently tortious or involved fraud, misrepresentation, or unfounded litigation, among other things.  *See Ellipsis, Inc. v. The Colorworks, Inc.*, 329 F.

---

[3]Although the defendant, in various points in its pleadings, refers to the plaintiff's tortious interference claim as "intentional interference with contract" (*see, e.g.,* Docket No. 33 at 14), the plaintiff, in fact, has claimed tortious interference with business relations (*see* Docket No. 1, attach. Compl. at 5).  This claim is analogous to, but distinct from, a claim alleging tortious interference with contracts.  *See Burch v. Gilliam Commc'ns, Inc.*, No. 05-2182D/P, 2005 WL 2373418, at *4 (W.D. Tenn. Sept. 26, 2005) (slip opinion) ("inducement of breach of contract . . . and intentional interference with business relationships are two distinct causes of action"); *Reardon v. Cambio Health Solutions, LLC*, No. 3:02-0351 at 14 (M.D. Tenn. Jan. 24, 2004) (unpublished); *Apollo Hair Sys. of Nashville v. First Lady Int'l Corp.*, No. M2003-02322-COA-R3-CV, 2005 WL 735032, at *3 (Tenn. Ct. App. Mar. 29, 2005) (unpublished).

6

Supp. 2d 962, 969 (W.D. Tenn. 2004); *Trau-Med of America, Inc.*, 71 S.W.3d at 701. The Tennessee Supreme Court has recognized that any analysis of whether a particular plaintiff has demonstrated the impropriety of a defendant's motive or means is fact-dependent, as "an all-encompassing definition of the term 'improper' is neither possible nor helpful." *Trau-Med of America, Inc.*, 71 S.W.3d at 701. The plaintiff here has alleged that the defendant's actions evidence both improper motive and improper means.

With respect to improper motive, the plaintiff claims that the defendant's predominant purpose in seeking to interfere with his business relationship with Onyx was to cause him injury. The defendant counters that its predominant purpose in seeking the restraining order was not to injure the plaintiff, but rather to protect its own confidential information and existing customer relationships, which it believed would be in jeopardy were the plaintiff to begin employ with Onyx. (*See* Docket No. 33 at 14) In evaluating a plaintiff's motive for signs of impropriety, a court must determine whether "the acts of which complaint is made . . . rest on some legitimate interest" or if they "extend beyond the bounds of doing business in a freely competitive economy." *Trau-Med of America, Inc.*, 71 S.W.3d at 700 (internal citation omitted).

Here, the plaintiff has failed to allege facts that would allow a reasonable jury to find impropriety with respect to the defendant's motive in enforcing the non-compete agreement. Even if each of the statements the plaintiff has provided as evidence of the defendant's improper motive were true (*see* Docket No. 39 at 8-9), none of them demonstrates that the defendant sought to enforce the non-compete agreement to harm the plaintiff, as opposed to legitimately wanting to protect its competitive business practices. For instance, the fact that the defendant did not seek a restraining order to enforce the non-compete agreements of some other former

7

employees who had left the defendant's employ to work for a competitor does not compel the conclusion that it was singling out the plaintiff for harm. The court finds the uncontested fact that "MPW had not been faced with a situation in which an employee at [the plaintiff's] level resigned to work for a competitor" to be particularly instructive on this point. (*See* Docket No. 47 at 3; *see also* Docket No. 46 ¶ 42 (response))

Acting out a desire to protect one's competitive interest does not "extend beyond the bounds of doing business in a freely competitive economy." *See Trau-Med of America, Inc.*, 71 S.W.3d at 700; *Riggs v. Royal Beauty Supply*, 879 S.W.2d 848, 851-52 (Tenn. Ct. App. 1994) (finding that a defendant's efforts to enforce a non-compete agreement against its former employee did not reveal an improper motive). Accordingly, the plaintiff has failed to raise a genuine issue of material fact as to whether the defendant was operating under an improper motive.

We now turn to the defendant's means. The plaintiff claims that the defendant's means of protecting its business interests, *i.e.*, its efforts to enforce the plaintiff's non-compete agreement via restraining order, were improper. He appears to rest his argument in part on the notion that the defendant's pursuit of the restraining order was impermissible because the plaintiff had not breached his non-compete agreement. He also claims that the defendant failed to reveal to the Davidson County Chancery Court that the plaintiff had initially refused to sign the non-compete agreement and that he had eventually signed only after the addition of terms providing him with a performance evaluation within a certain time period and with a particular

8

office location.[4]

Neither of these facts, even if true, would preclude the defendant from seeking a temporary restraining order to enforce the non-compete agreement. The history of the signing of the agreement and the existence of any additional terms thereto do not influence the propriety of the plaintiff's use of such means. Indeed, parties seeking to enforce such agreements may properly look to the courts. *See, e.g.*, *Warner v. Fuller Rehab. and Consulting Servs., Inc.*, No. 1:05-CV-105, 2005 WL 1490071 (E.D. Tenn. June 23, 2005) (unpublished) (defendant sought temporary restraining order to enforce non-compete agreement); *Kayem v. Stewart*, No. M2002-01515-COA-R3-CV, 2003 WL 22309466 (Tenn. Ct. App. Oct. 9, 2003) (unpublished) (plaintiff sought temporary restraining order to prevent enforcement of non-compete agreement).

Additionally, although the plaintiff alleges that he did not violate the non-compete agreement, nowhere in his papers does he challenge the defendant's assertions that it sought to enforce the order in good faith. Although the Chancery Court later held that the agreement was not binding, this does not render improper the defendant's efforts to uphold it. Such litigation was a necessary step in determining whether the non-compete agreement was enforceable.

---

[4]The defendant has filed a Motion to Strike Portions of the Affidavit of Roger Fulmer, which alleges that the portion of the plaintiff's affidavit that delineates the terms he allegedly added to his non-compete agreement "contains several factual assertions that are contradicted by Fulmer's deposition testimony and/or by his Responses to Defendant's First Set of Requests for Admission" and, therefore, must be stricken. (Docket No. 42) Because, as noted above, the existence of these terms is not relevant to the means used by the defendant to enforce the non-compete agreement, a ruling on this motion is unnecessary.

Additionally, the plaintiff has filed a Motion to Strike the Testimony of Timothy D. Wood (Docket No. 37), as well as a Motion to Strike Portions of the Affidavit of Stella Samons (Docket No. 36). Both of these motions involve testimony not relied on by the court in making its decision. Accordingly, the court declines to rule on either, as any decision about their merits is necessarily moot.

9

Because the defendant has failed to demonstrate that a reasonable jury could find that the defendant operated with an improper motive or used improper means to interfere with his business relationship, his tortious interference claim must fail. *See Trau Med of America, Inc.*, 71 S.W.2d at 701(listing improper motive or improper means as a necessary component of all demonstrations of tortious interference with business relationships).

### III. No reasonable jury could find that the defendant constructively discharged the plaintiff

The plaintiff next claims that the defendant constructively discharged him in retaliation for his complaints about the defendant's payment practices with respect to TVA contracts. The plaintiff alleges that this discharge constitutes a violation of the Tennessee Public Protection Act (TPAA),[5] which provides that "no employee shall be discharged or terminated solely for refusing to participate in, or refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304 (2005). This enactment "is a statutory recognition that the protection of employees who report violations of laws, regulations, and rules is a part of Tennessee public policy." *Mason v. Seaton*, 942 S.W.2d 470, 475 (Tenn. 1997).

To establish a *prima facie* case of retaliatory discharge under the TPAA, the plaintiff must demonstrate the following four elements: (1) the plaintiff's status as an employee of the defendant; (2) the plaintiff's refusal to participate in, or to remain silent about, illegal activities;

---

[5]In his Complaint, the plaintiff also claimed that his alleged constructive discharge constituted a violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140 (2000). At the case management conference, however, plaintiff's counsel stated that he did not intend to pursue any claim under ERISA. This claim, therefore, must be treated as abandoned.

10

(3) the employer's discharge of the employee; and (4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.  *Caruso v. St. Jude's Children's Research Hosp., Inc.*, 215 F. Supp. 2d 930, 937 (W.D. Tenn. 2002); *Voss v. Shelter Mut. Ins. Co.*, 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997).  The plaintiff has failed to establish at least the third element of this cause of action, which requires him to demonstrate that a reasonable jury could find that the defendant discharged him.

To demonstrate that he was constructively discharged, the plaintiff must adduce evidence to show that (1) his employer "deliberately create[d] intolerable working conditions, as perceived by a reasonable person"; and (2) did so "with the intention of forcing the employee to quit."  *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (internal quotations omitted).  A finding of constructive discharge in the Sixth Circuit "requires an inquiry into both the objective feelings of an employee and the intent of the employer."  *Kinamore v. EPB Elec. Util.*, 92 Fed. App'x 197, 204 (6th Cir. 2004).

Such a discharge exists if "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Kinamore*, 92 Fed. App'x at 204-05 (quoting *Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir. 1987)).  The following factors are relevant to a court's analysis of whether an employee was constructively discharged: (1) a demotion; (2) a reduction in salary; (3) a reduction in job responsibilities; (4) a reassignment to menial or degrading work; (5) a reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer designed to encourage the employee's resignation; and (7) offers of early retirement or continued

11

employment on terms less favorable than the employee's former status. *Kinamore*, 92 Fed. App'x at 205 (citing *Logan*, 259 F.3d at 569).

Here, the plaintiff claims that the alleged "stiff resistance" he experienced from the defendant's senior management upon his complaints about the defendant's TVA-related payment practices, coupled with the fact that he received "no assurance that the payments would be made," amounted to a constructive discharge because "he was scared for [the defendant] and himself, and he could no longer tolerate [the defendant's] pay practices and was forced to leave . . . to seek other employment as a direct result." (Docket No. 39 at 11) The plaintiff has not demonstrated that these challenged actions rise to the level of severity necessary to be considered objectively intolerable working conditions. Indeed, they do not tenably evidence any of the *Logan* factors delineated above.

Additionally, the plaintiff has not produced evidence to refute the defendant's argument that its adoption of the contested TVA payment practices was wholly unrelated to the plaintiff's status as an employee. The defendant's use of these payment methods cannot reasonably signify its intent to force the plaintiff to quit. The defendant has testified–and the plaintiff has not rebutted–that it "believed it was doing nothing wrong" and was "surprised by [the plaintiff's] resignation." (*See* Docket No. 47 at 10-11); *see also Mayberry v. Endocrinology-Diabetes Assoc.*, 926 F. Supp. 1315, 1326 (M.D. Tenn. 1996) (rejecting a constructive discharge claim where the plaintiff had presented no proof to suggest that the defendant intended to cause her to resign).

Accordingly, because the plaintiff has failed to demonstrate that a reasonable jury could find that the defendant discharged him, his claim for retaliatory constructive discharge must fail.

12

## CONCLUSION

The plaintiff has failed to offer evidence that would allow a reasonable jury to conclude that the defendant tortiously interfered with his business relations or constructively discharged him in violation of the TPAA. Thus, the defendant's Motion for Summary Judgment will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge