UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ROGER L. FULMER, | ) | |
| | ) | |
|     Plaintiff, | ) | Case No. 3:04-0879 |
| | ) | Judge Trauger |
| v. | ) | |
| | ) | |
| MPW INDUSTRIAL SERVICES, INC., | ) | |
| | ) | |
|     Defendant. | ) | |

## MEMORANDUM

Pending before the court is the defendant's Motion for Sanctions Pursuant to Fed. R. Civ. Pro. 11 (Docket No. 54), to which the plaintiff has responded (Docket No. 56), and the defendant has replied (Docket No. 57). For the reasons discussed herein, the defendant's motion will be denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The defendant corporation operates throughout North America and provides industrial cleaning services to the utility, pulp, paper, steel, and automotive industries.[1] In February 1997, the defendant hired the plaintiff to work as a Branch Manager and to open and operate its

---

[1]Unless otherwise noted, the facts have been drawn from the plaintiff's Complaint (Docket No. 1, attach. Compl.), the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Docket No. 40), and the plaintiff's Response in Opposition to Motion for Summary Judgment (Docket No. 39).

1

Nashville office.  Under the terms of his employ, the plaintiff was required to execute non-compete and non-disclosure agreements.  Such agreements were included as part of his employment application and as a condition to his participation in the management bonus program.

At the time of the plaintiff's employment with the defendant, the Tennessee Valley Authority (TVA) was the largest and most important client of the defendant's Nashville office.  It supplied approximately three-fourths of that branch's revenue.  The terms of the defendant's contract with the TVA required it to pay specific rates to laborers and foremen, as well as to "make a contribution for health and welfare benefits and a contribution for pension benefits on all TVA contracts."  (*See* Docket No. 40 ¶ 24.)  In "the latter part of 2000 or the early part of 2001," the plaintiff became concerned about the manner in which the defendant was making these payments, and he came to believe that the defendant was charging its customers overtime rates, yet paying its employees at "straight time" levels.  (*See* Docket No. 39 at 2.)

Believing these practices to be improper, the plaintiff, in 2001, reported them to Monte Black, the defendant's president and CEO.  Throughout 2001, 2002, and 2003, the plaintiff continued to raise the issue with various members of the defendant's management, including Vice President of Operations Jim Mock, Regional Controller Peter Schumacher, Director of Human Resources Patrick O'Rourke, Human Resources Administration Manager Stella Samons, and Division Manager Robby Speights.

The plaintiff claims that these complaints were met with "stiff resistance" and that he "received no assurance that the problem would be fixed."  (*See* Docket No. 40 ¶ 30.)  The defendant responds that its employees researched the issue and repeatedly explained to the

plaintiff that its practices were permissible and that, accordingly, no remedies were in order. (*See* Docket No. 47 at 10.) The plaintiff admits that no one associated with the defendant ever "explicitly or implicitly threatened [the plaintiff's] job because of his repeated complaints about [the defendant's] pay practices." (*See* Docket No. 40 ¶ 41.)

In approximately early 2003, the plaintiff began speaking with representatives of Onyx Industrial Services (Onyx) about employment opportunities with that corporation. Onyx is the defendant's direct competitor in Tennessee and surrounding areas. Onyx eventually offered the plaintiff a position as a regional manager, which included a compensation package worth more than what the plaintiff was receiving from the defendant. The plaintiff accepted this offer in approximately August 2003. He then entered into non-compete and non-disclosure agreements with Onyx. The plaintiff resigned from his position with the defendant effective August 8, 2003. Two senior operations managers who had worked under the plaintiff soon left the defendant to go to work for Onyx as well. (*See* Docket No. 33 at 1.)

On August 13, 2003, the defendant filed, in the Davidson County Chancery Court, an injunction action against the plaintiff, the two operations managers who had departed with him, and Onyx.[2] (*See* Docket No. 46 ¶ 18.) Based upon non-compete agreements between MPW and the three men, the Chancery Court issued a restraining order that temporarily prevented the men from working for Onyx. (*See id.*)

On September 17, 2003, after conducting an evidentiary hearing and determining that the non-compete agreement the plaintiff had signed with the defendant was unenforceable, the

---

[2]In October 2003, the defendant and Onyx reached a settlement in this state court case, pursuant to which MPW dismissed with prejudice its claims against each of the defendants, including the plaintiff in this case. (*See* Docket No. 33 at 1.)

3

Chancery Court dissolved the restraining order. According to the plaintiff, after "almost four months of unemployment," he then began his employ with Onyx. (*See* Docket No. 40 at 31.)

On September 28, 2004, the plaintiff filed a Complaint in this court alleging that the defendant had tortiously interfered with his business relations with Onyx and had constructively discharged him in retaliation for his complaints about the defendant's payment practices. (*See* Docket No. 1.) The defendant moved for summary judgment on these claims (*see* Docket No. 32), which motion was granted (*see* Docket No. 52). One week later, the defendant filed its Motion for Sanctions Pursuant to Fed. R. Civ. P. 11. (*See* Docket No. 54.)

## **ANALYSIS**

**I.      Standard for Rule 11 Analysis**

Rule 11 of the Federal Rules of Civil Procedure provides the following:

> Every pleading, written motion, and other paper shall be signed by at least one attorney of record in the attorney's individual name . . . By presenting to the court . . . a pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, [that] . . . it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; [and that] . . . the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law . . . If, after notice and a reasonable opportunity to respond, the court determines that [these requirements have] been violated, the court may . . . impose an appropriate sanction upon the attorneys, law firms, or parties that have violated [the requirements] or are responsible for the violation.

Fed. R. Civ. P. 11.

Rule 11 "imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well-grounded in fact, legally tenable, and 'not interposed for any improper purpose.'" *McGhee v. Sanilac County*, 934

4

F.2d 89, 92 (6th Cir. 1991) (quoting *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 390 (1990)).

"[T]he central purpose of Rule 11 is to deter baseless filings in District Court and thus . . . streamline the administration and procedure of the federal courts." *See Cooter & Gell*, 496 U.S. at 390. The Supreme Court has emphasized, however, that Rule 11 is to be "read in light of the concerns that it will spawn satellite litigation and chill vigorous advocacy." *Id.; see also* Fed. R. Civ. P. 11 advisory committee's note ("The rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories.").

The test in the Sixth Circuit for the imposition of Rule 11 sanctions is "whether the individual attorney's conduct was reasonable under the circumstances." *See McGhee*, 934 F.2d at 93 (internal quotation omitted). Attorneys in this circuit have a "continuing responsibility" to review their pleadings throughout the stages of their litigation in order to ensure that they remain Rule 11-compliant. *See Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 959 (6th Cir. 1990).

In determining whether a violation of Rule 11 has occurred, a district court should not use the benefit of hindsight but, instead "should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *See id.* (internal quotation omitted). Because the Rule 11 standard is permissive, district courts have substantial leeway in making this determination. *See Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 996-97 (6th Cir. 1994) (recognizing that the 1993 amendments to Rule 11 rendered it discretionary); *see also Nieves v. City of Cleveland*, 153 Fed. App'x 349, 352 (6th Cir. 2005) ("Because the district court knows best how to regulate its forum, it has broad discretion in determining when a sanction is warranted and what sanction is appropriate.");

5

*Shelton v. City of Taylor*, 92 Fed. App'x 178, 185 (6th Cir. 2004) (noting that "[d]iscretion [in granting sanctions] implies a range of choice").

The defendant has moved for sanctions against the plaintiff based on both the plaintiff's claim that the defendant tortiously interfered with his business relations with Onyx and his complaint that he was constructively discharged. Because these claims, while lacking in legal merit, were reasonable under the circumstances, the defendant's motion for sanctions will be denied.

## II. Sanctions should not be imposed on the plaintiff based on his complaint that the defendant tortiously interfered with his business relations.

In order to demonstrate that the defendant tortiously interfered with his business relations,[3] the plaintiff was responsible for demonstrating the following: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference. *Trau-Med of America, Inc. v.*

---

[3] Although the defendant, in various points in its pleadings, referred to the plaintiff's tortious interference claim as "intentional interference with contract" (*see, e.g.,* Docket No. 33 at 14), the plaintiff, in fact, claimed tortious interference with business relations (*see* Docket No. 1, attach. Compl. at 5). This claim is analogous to, but distinct from, a claim alleging tortious interference with contracts. *See Burch v. Gilliam Commc'ns, Inc.*, No. 05-2182D/P, 2005 WL 2373418, at *4 (W.D. Tenn. Sept. 26, 2005) (slip opinion) ("inducement of breach of contract . . . and intentional interference with business relationships are two distinct causes of action"); *Reardon v. Cambio Health Solutions, LLC*, No. 3:02-0351 at 14 (M.D. Tenn. Jan. 24, 2004) (unpublished); *Apollo Hair Sys. of Nashville v. First Lady Int'l Corp.*, No. M2003-02322-COA-R3-CV, 2005 WL 735032, at *3 (Tenn. Ct. App. Mar. 29, 2005) (unpublished).

6

*Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (emphasis and internal citations omitted).

The plaintiff's argument that the defendant tortiously interfered with his business relations rested on his assertion that the defendant used improper means or an improper motive when it attempted to enforce the non-compete agreement that the plaintiff had signed. (*See* Docket No. 39 at 7.) Because parties seeking to enforce such agreements may properly look to the courts, the plaintiff's claim that the defendant used improper means in attempting to enforce the agreement was not reasonably tenable. *See Ellipsis, Inc. v. The Colorworks, Inc.*, 329 F. Supp. 2d 962, 969 (W.D. Tenn. 2004) (outlining the standard for judging whether a party used improper means, *i.e.,* means that were independently tortious or involved fraud, misrepresentation, or unfounded litigation, among other things); *see, e.g.*, *Warner v. Fuller Rehab. and Consulting Servs., Inc.*, No. 1:05-CV-105, 2005 WL 1490071 (E.D. Tenn. June 23, 2005) (unpublished) (defendant sought temporary restraining order to enforce non-compete agreement); *Kayem v. Stewart*, No. M2002-01515-COA-R3-CV, 2003 WL 22309466 (Tenn. Ct. App. Oct. 9, 2003) (unpublished) (plaintiff sought temporary restraining order to prevent enforcement of non-compete agreement). Although the Chancery Court later held that the agreement was not binding, this did not reasonably evidence the defendant's use of improper means. Such litigation was a necessary step in determining whether the non-compete agreement was enforceable.

Taking care not to use the advantages of hindsight, however, the court finds that the plaintiff's assertion that the defendant had an improper motive in attempting to enforce the non-compete agreement was "reasonable under the circumstances." *See McGhee*, 934 F.2d at 93 (noting that the Sixth Circuit test for the imposition of Rule 11 sanctions is "whether the

7

individual attorney's conduct was reasonable under the circumstances"). Although this court ultimately determined that the defendant was entitled to judgment as a matter of law on this claim (*see* Docket No. 52), the plaintiff's conviction that the defendant's "predominant purpose" in seeking to end his business relationship with Onyx was to cause him harm was not so unreasonable to as to be deserving of sanctions. *See Ellipsis*, 329 F. Supp. 2d at 969 (noting that a finding of improper motive requires a determination that "the defendant's predominant purpose was to injure the plaintiff"). The plaintiff's belief that the defendant was maliciously singling him out by enforcing only his non-compete agreement, but not those of his colleagues, while not legally dispositive, lends enough credibility to the claim to render sanctions inappropriate. *See Trau-Med of America, Inc.*, 71 S.W.3d at 701 (noting that "a determination of whether the defendant acted 'improperly' or possessed an 'improper' motive is dependent on the facts and circumstances of a given case"); (*see also* Docket No. 38 at 30 (alleging that "Mr. Fulmer and his subordinates [whose non-compete agreements also were enforced] were the only MPW employees to complain about MPW's pay practices")). Accordingly, the defendant's request for sanctions as to this claim will be denied.

**III. Sanctions are not appropriate with respect to the plaintiff's claim that he was constructively discharged in retaliation for his complaints about the defendant's payment practices.**

To establish a *prima facie* case of retaliatory discharge under the Tennessee Public Protection Act (TPAA), the statute on which the plaintiff relied to make this claim, he needed to demonstrate four elements: (1) his status as an employee of the defendant; (2) his refusal to participate in, or to remain silent about, illegal activities; (3) the employer's discharge of him;

8

and (4) an exclusive causal relationship between his refusal to participate in or remain silent about illegal activities and the employer's termination of the him. *Caruso v. St. Jude's Children's Research Hosp., Inc.*, 215 F. Supp. 2d 930, 937 (W.D. Tenn. 2002); *Voss v. Shelter Mut. Ins. Co.*, 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997). The court granted the defendant's Motion for Summary Judgment on this claim after determining that no genuine issue of material fact existed as to whether the plaintiff had been constructively discharged. (*See* Docket No. 51 at 11.)

In order to demonstrate that he was constructively discharged from his position with the defendant, the plaintiff was required to show that (1) the defendant "deliberately create[d] intolerable working conditions, as perceived by a reasonable person"; and (2) did so "with the intention of forcing the [plaintiff] to quit." *See Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (internal quotations omitted).

An evaluation of the instances in which the Sixth Circuit has either granted sanctions or upheld their imposition reveals that, in order to be considered "unreasonable" so as to warrant penalization, a party's conduct must be relatively egregious. *See McGhee*, 934 F.2d at 93 (noting that the test in the Sixth Circuit for the imposition of Rule 11 sanctions is "whether the individual attorney's conduct was reasonable under the circumstances"). For instance, the Sixth Circuit upheld a district court's imposition of sanctions on a plaintiff who filed suit against a defendant with respect to which it had waived all claims. *See Morris v. City of Detroit Water & Sewage Dep't*, 20 Fed. App'x 466, 467 (6th Cir. 2001). That court also affirmed the granting of sanctions against an attorney who failed to do any reasonable investigation to establish the truth of the plaintiff's claims, but instead "blindly relied on his client's accusations." *See Nieves*, 153

9

Fed. App'x at 353. In contrast, the court upheld a denial of sanctions even when the party against whom sanctions were sought had presented legal theories that were "rejected as thinly supported by the facts." *See Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 779 (6th Cir. 1996). A comparison of these cases with the one at hand demonstrates that, as in *Hartleip*, the plaintiff's constructive discharge arguments here, while thinly supported by the facts, are undeserving of sanctions.

The plaintiff claimed that the alleged "stiff resistance" he experienced from the defendant's senior management upon his complaints about the defendant's TVA-related payment practices, coupled with the fact that he received "no assurance that the payments would be made," amounted to a constructive discharge because "he was scared for [the defendant] and himself, and he could no longer tolerate [the defendant's] pay practices and was forced to leave . . . to seek other employment as a direct result." (*See* Docket No. 39 at 11.) The court found that the plaintiff had failed to demonstrate a genuine issue of material fact as to whether the defendant, in adopting its pay practices, had deliberately created intolerable working conditions or had done so with the intent of forcing the plaintiff to quit. (*See* Docket No. 51 at 12); *see also Logan*, 259 F.3d at 569.

While, as the defendant emphasizes, the court noted that imposition of the pay practices did not "tenably evidence" intolerable working conditions, (*see* Docket No. 55 at 9), the plaintiff's assertion of such does not warrant sanctions. Given the undisputed fact that the plaintiff genuinely believed that these practices were illegal, as well as his allegations that he was "scared not only for the company but also for himself," (*see* Docket No. 10 at 39), his allegations of constructive discharge were not entirely unreasonable under the circumstances.

10

*See McGhee*, 934 F.2d at 93.

Additionally, although the factual allegations offered by the plaintiff provide only thin support to the argument that the defendant created its purportedly intolerable working conditions with the intention of forcing the plaintiff to quit, this argument is not so egregious as to warrant sanctions. *See Cooter*, 496 U.S. at 390 (noting that courts applying Rule 11 should read the rule in light of concerns that it could "chill vigorous advocacy"). Because the defendant allegedly never explained to the plaintiff why its pay practices were proper, despite the plaintiff's repeated complaints about them, the argument that it intended to force him to quit was not wholly unreasonable. *See McGhee*, 934 F.2d at 93. Accordingly, sanctions will not be granted as to this claim.

## CONCLUSION

Because the plaintiff's claims that the defendant tortiously interfered with this business relations and constructively discharged him, while lacking in legal merit, were reasonable under the circumstances, the defendant's motion for sanctions will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge